IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FREEDOM FROM RELIGION  :
FOUNDATION, INC., STEPHEN  :
MEHOLIC, DAVID SIMPSON, JOHN :
BERRY, AND CANDACE WINKLER, :
          :
    Plaintiffs,  :   CIVIL ACTION NO. 16-4504
          :
  v.       :
          :
THE COUNTY OF LEHIGH ,   :
          :
    Defendant.  :

## <u>MEMORANDUM OPINION</u>

Smith, J.                 September 28, 2017

   The Establishment Clause of the First Amendment to the United States Constitution, as incorporated against the states through the Fourteenth Amendment, provides that Congress, state governments, and local governments cannot make laws that establish religion. Plaintiffs challenge the defendant's seal and flag, as depicted below, as violating the Establishment Clause because they include a large, central Latin cross. The parties filed cross-motions for summary judgment that are currently pending before the court.




While the court does not believe the current state of the law applicable to this case comports with the text of the Establishment Clause, the court is not in a position to reject it. The law, as it currently stands, requires that the court rule in favor of the plaintiffs: the inclusion of the cross lacked a secular purpose both when the defendant adopted the seal and when the defendant refused to remove the cross from the seal, and a reasonable observer would perceive the seal as endorsing Christianity. Thus, the court will grant the plaintiffs' motion for summary judgment, and deny the defendant's motion for summary judgment.

## I.      PROCEDURAL HISTORY

The plaintiffs in this matter are the Freedom From Religion Foundation, Inc. ("FFRF"), which is "a membership association of freethinkers (atheists, agnostics, and other nonbelievers) that works to promote the separation of state and church," and four local residents who are members of FFRF. Compl. at ¶ 1, Doc. No. 1. The plaintiffs contend that the Latin cross on the seal and flag of the defendant, the County of Lehigh ("the County"), violates the Establishment Clause of the First Amendment, and accordingly filed this action against the County on August 16, 2016. Doc. No. 1. They seek declaratory and injunctive relief, along with nominal damages. Compl. at pp. 11-12. After conducting discovery, the parties filed cross-motions for summary judgment on May 5, 2017. Doc. Nos. 19, 20. The parties filed responses to the motions on June 2, 2017. Doc. Nos. 24, 25. The court heard oral argument on June 13, 2017. Doc. No. 26. The cross-motions for summary judgment are now ripe for disposition, and the parties agree that the court should resolve this dispute on the current record as a matter of law.

## II.      FACTUAL BACKGROUND

The undisputed facts are as follows. On December 28, 1944, the Lehigh County Board of Commissioners (the "Board" or "Commissioners") unanimously adopted an "Official Shield and

Coat of Arms of Lehigh County" (the "Seal") at a meeting. Pls.' Concise Statement of Material Facts ("Pls.' Facts") at ¶¶ 1, 2, Doc. No. 20-2; Defendant's Resp. to Pls.' Concise Statement of Material Facts ("Def.'s Resp.") at ¶¶ 1, 2, Doc. No. 24; Def.'s Concise Statement of Material Facts ("Def.'s Facts") at ¶ 1, Doc. No. 19-1; Pls.' Resp. to Def.'s Concise Statement of Material Facts ("Pls.' Resp.") at ¶ 1, Doc. No. 25-1. A color print of the approved Seal was included in the official minutes of the December 28, 1944 meeting, and it remains the County's Seal. Pls.' Facts at ¶¶ 3, 4; Def.'s Resp. at ¶¶ 3, 4; Def.'s Facts at ¶ 2; Pls.' Resp. at ¶ 2. The original print of the Seal is set forth below:



Pls.' Facts at ¶ 5; Def.'s Resp. at ¶ 5; Def.'s Facts at ¶ 2; Pls.' Resp. at ¶2.

A copy of the Proceedings of the Lehigh County Historical Society from August 1946 contains an article titled "Lehigh County Shield" (the "Historical Society article") that indicates that County Commissioner Harry D. Hertzog designed the Seal. Pls.' Facts at ¶ 10; Def.'s Resp. at ¶ 10; Def.'s Facts at ¶ 6; Pls.' Resp. at ¶ 6. In the Historical Society article, Commissioner Hertzog described the symbolic significance of each of the elements appearing on the Seal. Pls.' Facts at ¶ 11; Def.'s Resp. at ¶ 11. According to Commissioner Hertzog, the "huge cross in canary-yellow" in the center of the Seal signifies "Christianity and the God-fearing people which are the foundation and backbone of [Lehigh] County." Pls.' Facts at ¶¶ 12, 13; Def.'s Resp. at ¶¶

12, 13; Def. Facts at ¶ 6; Pls.' Resp. at ¶ 6. The building superimposed over the bottom of the cross is the "historical and beautiful old Court House." Pls.' Facts at ¶ 13; Def.'s Resp. at ¶ 13; Def.'s Facts at ¶ 6; Pls.' Resp. at ¶ 6. The other symbols surrounding the cross and courthouse represent various aspects of Lehigh County. For example, the red heart is the emblem of the City of Allentown, the two books and the lamp of learning represent the education system, the red buntings represent clothing manufacturing industries, the bison represents hoof animals that the County Preserve protects, the cement silos represent the cement industry, the other buildings represent diversified industries, and the agricultural symbolism represents the agricultural industry. Pls.' Facts at ¶ 14; Def.'s Resp. at ¶ 14; Def.'s Facts at ¶ 6; Pls.' Resp. at ¶ 6.

Today, a digitized version of the Seal is present on the header of the County's website. Pls.' Facts at ¶¶ 16, 17; Def.'s Resp. at ¶¶ 16, 17. In addition to the website, the Seal is present on a variety of County documents, including property tax paperwork, County letterhead, and County business cards. Pls.' Facts at ¶ 18; Def.'s Resp. at ¶ 18; Def.'s Facts at ¶ 21; Pls.' Resp. at ¶ 21. The Seal is also displayed on various vehicles, and at the County Courthouse, a nature preserve, parks, a previously-operational juvenile detention facility, the Coroner's building, and the jail. Pls.' Facts at ¶¶ 19-20; Def.'s Resp. at ¶¶ 19-20; Def.'s Facts at ¶¶ 20, 21; Pls.' Resp. at ¶¶ 20, 21. A Seal measuring several feet in diameter is displayed within the Public Hearing Room of the Government Center behind where the County Commissioners sit during Board meetings. Pls.' Facts at ¶ 21; Def.'s Resp. at ¶ 21. It has also been displayed on television monitors in the Public Hearing Room during meetings. Pls.' Facts at ¶ 22; Def.'s Resp. at ¶ 22.

During the December 28, 1944 meeting at which the Commissioners adopted the Seal, the Board also agreed to purchase a flag that would include a reproduction of the Seal (the "Flag"). Pls.' Facts at ¶ 23; Def.'s Resp. at ¶ 23; Def.'s Facts at ¶ 5; Pls.' Resp. at ¶ 5. The

modern representation of the Flag contains a multi-colored version of the Seal. Pls.' Facts at ¶ 24; Def.'s Resp. at ¶ 24. The Flag is displayed at numerous locations throughout the County, including: an airport, a work-release center, a detox center, a nursing home, a baseball stadium, the Velodrome, a nature preserve, an apartment complex, the Agricultural Preservation Building, a juvenile detention facility, the coroner's building, the Government Center, the courthouse, the jail, the Lehigh Valley Planning Commission, and the Lehigh and Northampton Transportation Authority. Pls.' Facts at ¶ 25; Def.'s Resp. at ¶ 25; Def.'s Facts at ¶ 22; Pls.' Resp. at ¶ 22.

The Board has the authority to create or modify the Seal, and the County administration has the authority to replicate and place the Seal throughout the County. Pls.' Facts at ¶¶ 6, 7; Def.'s Resp. at ¶¶ 6, 7; Def.'s Facts at ¶¶ 9, 10; Pls.' Resp. at ¶¶ 9, 10. The County is aware of no official action taken since 1944 to vary the appearance of the Seal, and there are no official records indicating any official action to celebrate the seal. Pls.' Facts at ¶ 15; Def.'s Resp. at ¶ 15; Def. Facts at ¶¶ 8, 11; Pls.' Resp. at ¶¶ 8, 11.

From the time of the Seal's adoption up until November 2014, the County did not receive any complaints regarding either the Seal or the Flag. Def.'s Facts at ¶ 49; Pls.' Resp. at ¶ 49. On November 5, 2014, however, FFRF sent a letter to the County Executive, Thomas Muller ("Muller"), stating that the inclusion of the Latin cross on the Seal "violates the Establishment Clause of the First Amendment" and urging the County to "immediately discontinue using this seal and . . . develop a new seal that is both constitutional and representative of all citizens." Pls.' Facts at ¶¶ 78, 79; Def.'s Resp. at ¶¶ 78, 79; Def.'s Facts at ¶ 23; Pls.' Resp. at ¶ 23. On January 16, 2015, FFRF sent a second letter to Muller "regarding the prominent cross on Lehigh County's seal," and requested a written response from the County "as to what actions have been

taken to resolve these concerns." Pls.' Facts at ¶ 81; Def.'s Resp. at ¶ 81; Def.'s Facts at ¶ 24; Pls.' Resp. at ¶ 24.

The Board first became aware of FFRF's complaint regarding the Seal after the County received the second letter dated January 16, 2015. Def.'s Facts at ¶ 25; Pls.' Resp. at ¶ 25. After receiving that second letter, in order to understand FFRF's complaint, the Board sought to gather information pertaining to the Seal's history and the meaning behind the symbols it depicts. Pls.' Facts at ¶ 84; Def.'s Resp. at ¶ 84; Def.'s Facts at ¶ 30; Pls.' Facts at ¶ 30. Most of the Commissioners were unaware of the Seal's history, and they essentially had to "start from scratch." Def.'s Facts at ¶ 31; Pls.' Resp. at ¶ 31. The Lehigh County Historical Society provided the Historical Society article containing Commissioner Herzog's description of the Seal and the "huge cross in canary-yellow [that] signif[ies] Christianity." Pls.' Facts at ¶ 12; Def.'s Resp. at ¶ 12; Def.'s Facts at ¶ 6; Pls.' Resp. at ¶ 6. The Board was unable to obtain any first-hand historical information about the Seal's adoption. Def.'s Facts at ¶ 42; Pls.' Resp. at ¶ 42.

On March 25, 2015, at a public meeting, the Board voted to retain the Seal. Pls.' Facts at ¶ 91; Def.'s Resp. at ¶ 91. The Board also presented and voted on a draft of a letter to be sent in response to FFRF's complaint from Matthew Sorrentino, the Lehigh County Solicitor. Pls.' Facts at ¶ 92; Def.'s Resp. at ¶ 92; Def.'s Facts at ¶¶ 38-40; Pls.' Resp. at ¶¶ 38-40. The letter, which was unanimously approved, said, in relevant part:

> The Commissioners have made inquiries with the local Historical Society concerning the history and purpose of the various symbols on the County seal. If you have examined the seal in detail, you will have noted that it contains many different symbols and elements, each with historical significance to Lehigh County. The cross, one of more than a dozen elements, was included to honor the original settlers of Lehigh County who were Christian.
>
> It is the position of the Lehigh County that the presence of the cross on the seal among all the other items of historical significance has the secular purpose of recognizing the history of the County. As such, it does not violate the

Establishment Clause. Accordingly, the County is not planning on removing the cross from the seal.

Def.'s Facts at ¶ 41; Pls.' Resp. at ¶ 41.

The Board did not know why the Commissioners decided to include a cross on the Seal in 1944, and knew only what Commissioner Hertzog had said in the Historical Society article. Affidavit of Brad Osborne at ¶ 6, Doc. No. 24-1. "The Board of Commissioners did not approve [the letter] in order to attribute a different meaning to the cross than the meaning attributed to it by Commissioner Hertzog in 1946." *Id.* Rather, the Board ultimately viewed the cross as honoring "the original settlers of Lehigh County who were Christian" after processing the Historical Society Article. *Id.* at ¶ 7. The Board interpreted the information contained in the Historical Society article to mean that the cross was one of the dozen or so symbols on the Seal that represented things important to the early settlers of Lehigh County. Def.'s Facts at ¶ 44; Pls.' Resp. at ¶ 44.

Commissioner Brad Osborne, a current County Commissioner, believes that the cross on the Seal "represents the early Christian settlers," and that this was "something that [the Board of Commissioners who originally adopted the Seal] felt w[as] important to document as far as the history." Def.'s Facts at ¶ 50; Pls.' Resp. at ¶ 50. He also believes that the cross is "a secular symbol representing just the history of the early settlers," something that "the early settlers found important in their lives as they settled the area back in the 1700's." *Id.* The County acknowledges that the Historical Society article does not state that the cross was included in the Seal to honor the original Christian settlers of Lehigh County, as the County stated in its letter to FFRF. Pls.' Facts at ¶ 88; Def.'s Resp. at ¶ 88. The County maintains the position it set forth in its March 25, 2015 letter to FFRF, and has not gathered any further information about the Seal's

origins since sending that letter. Pls.' Facts at ¶ 94; Def.'s Resp. at ¶ 94; Def.'s Facts at ¶ 45; Pls.' Resp. at ¶ 45.

There are four individual plaintiffs in this matter. Plaintiff Stephen Meholic ("Meholic") lives in Lehigh County, is a member of FFRF, and identifies as an atheist. Pls.' Facts at ¶¶ 26, 27, 33; Def.'s Resp. at ¶¶ 26, 27, 33; Def.'s Facts at ¶ 52; Pls.' Resp. at ¶ 52. Meholic has had contact with the Seal while attending Commissioners' meetings, both on the wall behind the Commissioners and on the television screens in the Public Hearing Room, at the Airport, on the County website, and on County documents such as freedom of information forms. Pls.' Facts at ¶¶ 28-31; Def.'s Resp. at ¶¶ 28-31; Def.'s Facts at ¶¶ 53-55; Pls.' Resp. at ¶¶ 53-55. Meholic plans to have contact with the Seal in the future because he plans to attend future Commissioners' meetings. Pls.' Facts at ¶ 32; Def.'s Resp. at ¶ 32. He finds the cross offensive because it does not represent him, he feels as though the County is trying to force religion on him, and he views the County's inclusion of the cross as an official endorsement. Pls.' Facts at ¶¶ 34-35; Def.'s Resp. at ¶¶ 34-35; Def.'s Facts at ¶ 56; Pls.' Resp. at ¶ 56.

David Simpson ("Simpson") lives in Lehigh County, is a member of FFRF, and also identifies as an atheist. Pls.' Facts at ¶¶ 40, 41, 46; Def.'s Resp. at ¶¶ 40, 41, 46. Simpson first encountered the Flag when he went to the Lehigh County Sheriff's Office, located within the courthouse, to obtain a license to carry a firearm. Pls.' Facts at ¶ 42; Def.'s Resp. at ¶ 42; Def.'s Facts at ¶ 69; Pls.' Resp. at ¶ 69. Simpson has also encountered the Seal on the County website, when handling tax forms, and at the courthouse. Pls.' Facts at ¶¶ 43-45; Def.'s Resp. at ¶¶ 43-45; Def.'s Facts at ¶¶ 71, 72; Pls.' Resp. at ¶¶ 71, 72. Simpson finds the presence of the cross on the Seal to be offensive, and interprets the presence of the cross on the Seal as an endorsement of Christianity because, in his experience, the cross is a symbol that mostly represents Christianity.

Pls.' Facts at ¶¶ 47, 48; Def.'s Resp. at ¶¶ 47, 48; Def.'s Facts at ¶ 70; Pls.' Resp. at ¶ 70. Each time he sees the Seal, Simpson also worries that the County may discriminate against him because of his atheism. Pls.' Facts at ¶¶ 50, 51; Def.'s Resp. at ¶¶ 50, 51.

John Berry ("Berry") lives in Lehigh County, is a member of FFRF, and is a non-practicing Methodist. Pls.' Facts at ¶¶ 53, 54, 62; Def.'s Resp. at ¶¶ 53, 54, 62; Def.'s Facts at ¶ 58; Pls.' Resp. at ¶ 58. Berry works in a County building, and has had contact with the Seal because the Seal is located on County vehicles that service the building. Pls.' Facts at ¶¶ 55, 56; Def.'s Resp. at ¶¶ 55, 56; Def.'s Facts at ¶ 60; Pls.' Resp. at ¶ 60. Berry has also seen the Seal at the courthouse, in the Public Hearing Room behind where the Commissioners sit, and on the County website, which he must use for his job. Pls.' Facts at ¶¶ 57-59; Def.'s Resp. at ¶¶ 57-59; Def.'s Facts at ¶¶ 61-63; Pls.' Resp. at ¶¶ 61-63. Berry will continue to encounter the Seal on the website, and because his local supervisor encourages him to attend Board meetings held at the courthouse. Pls.' Facts at ¶¶ 60-61; Def.'s Resp. at ¶¶ 60-61. Berry finds his contact with the Seal unwelcome because he believes the cross endorses, accepts, and promotes Christianity, and reminds him that he pays taxes to a government that supports a particular religion. Pls.' Facts at ¶¶ 64-65; Def.'s Facts at ¶¶ 64-65; Def.'s Facts at ¶ 64; Pls.' Resp. at ¶ 64.

Candace Winkler ("Winkler") lives in Lehigh County, is a member of FFRF, and identifies as an "anti-theist" because she feels that religion is damaging and that life would be better without it. Pls.' Facts at ¶¶ 68, 69, 74; Def.'s Resp. at ¶¶ 68, 69, 74; Def.'s Facts at ¶ 77; Pls.' Resp. at ¶ 77. Winkler first encountered the Seal when she received a 2015 real estate tax bill with the Seal on the letterhead of the assessment. Pls.' Facts at ¶ 70; Def.'s Resp. at ¶ 70; Def.'s Facts at ¶ 78; Pls.' Resp. at ¶ 78. Winkler is pursuing a real estate career and has encountered the Seal on the County website while looking at property assessments and tax

values.  Pls.' Facts at ¶ 71; Def.'s Resp. at ¶ 71; Def.'s Facts at ¶ 84; Pls.' Resp. at ¶ 84.  Winkler

also lives near the airport where she encounters the Seal clearly on the Flag.  Pls.' Facts at ¶ 72;

Def.'s Resp. at ¶ 72; Def.'s Facts at ¶¶ 81, 82; Pls.' Resp. at ¶¶ 81, 82.  Winkler opposes the

presence of a religious symbol on the Seal because she wishes to avoid the Christian Church, she

looks to her government to protect her from the Church, the cross reminds her of abuse by the

Church, and the cross normalizes Christianity at taxpayer-funded events.  Pls.' Facts at ¶¶ 75-77;

Def.'s Resp. at ¶¶ 75-77; Def.'s Facts at ¶ 83; Pls.' Resp. at ¶ 83.  She believes including the

cross on the Seal is contrary to the First Amendment guarantee that the government will not

discriminate against a person because of their religion.  Def.'s Facts at ¶ 80; Pls.' Resp. at ¶ 80.

## III.    DISCUSSION

### A.    The Establishment Clause's History & Modern Application

The First Amendment to the United States Constitution contains two clauses dealing with

religion.  The first of the two is the Establishment Clause, which constitutes the heart of this

litigation.   The Establishment Clause states: "Congress shall make no law respecting an

establishment of religion . . . ."  U.S. Const. amend. I.  There is ample historical evidence to

suggest that James Madison, the First Amendment's drafter, was concerned with the

establishment of a national religion similar to that of the Church of England that would encroach

on citizens' freedom of conscience, compel conformity, and levy taxes in its name.  For example,

the first proposed draft of the Establishment Clause said: "The civil rights of none shall be

abridged on account of religious belief or worship, nor shall any *national* religion be established,

nor shall the full and equal rights of conscience in any manner, or on any pretext, be abridged."

Philip B. Kurland, *The Origins of the Religion Clauses of the Constitution*, 27 Wm. & Mary L.

Rev. 839, 855 (1986) (emphasis added) (citation omitted).  During a debate in the House of

Representatives on August 15, 1789, Madison voiced his belief that the purpose of the Establishment Clause was that "Congress should not establish a religion, and enforce the legal observation of it by law, nor compel men to worship God in any manner contrary to their conscience." 1 Annals of Cong. 730 (1789), *reprinted in Wallace v. Jaffree*, 472 U.S. 38, 95 (1985) (Rehnquist, J., dissenting).[1] Madison also explained why he originally included the word "national" before the word "religion": "[T]he people feared one sect might obtain a preeminence, or two combine together, and establish a religion to which they would compel others to conform." *Id.* at 731, *reprinted in Wallace*, 472 U.S. at 96.

This understanding of the Establishment Clause is also evident from Madison's Memorial and Remonstrance Against Religious Assessments, a document he authored as a reaction to a bill introduced in the Virginia General Assembly in 1785 that would have assessed taxes to support Christian religion teachers. *See Flast v. Cohen*, 392 U.S. 83, 104 n.24 (1968). In that writing, Madison suggested that the essence of religious liberty was to leave religion "to the conviction and conscience of every man" and to preserve "moderation and harmony" among different religious sects. James Madison, Memorial and Remonstrance Against Religious Assessments (1785), *reprinted in Everson v. Board of Ed. Of Ewing Twp.*, 330 U.S. 1, 63-72 (1947).

If the drafters' intent and the plain text of the Establishment Clause had alone guided the evolution of modern First Amendment jurisprudence and shaped the law applicable to this case, its resolution would be cut-and-dry. By including a Latin cross on the Seal, the County has chosen to celebrate the Christian values important throughout its history. The County has not, however, legally compelled its citizens to practice and conform to Christianity, infringed on freedom of conscience, or created political conflict between the Christian Church and other

---

[1] Justice Rehnquist's full dissent in *Wallace* provides a more comprehensive discussion of the history of the Establishment Clause in Congress. 472 U.S. at 92-106.

religious sects. Simply put, the County of Lehigh did not intend to "establish" religion or institute a County religion when it adopted Commissioner Herzog's design for the Seal. And if it had intended to do so, it has certainly failed—one of the plaintiffs himself testified that per the 2010 census, 49 percent of the County reported no religious affiliation at all. Pls.' Facts at ¶ 38; Def.'s Resp. at ¶ 38.

While such considerations appear to be a matter of common-sense in determining whether a government has established a religion in violation of the First Amendment, binding precedent has taken the inquiry in a different direction. The evolution of modern Establishment Clause jurisprudence began with *Everson v. Board of Education*, in which Justice Black emphasized the principle of "a wall of separation between Church and State" as underlying the Clause. 330 U.S. at 16. The Supreme Court appears to have relied on that principle in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), when the Court formulated the three-pronged test now commonly referred to as "the *Lemon* test." According to the *Lemon* test, a challenged government action violates the Establishment Clause if (1) it lacks a secular purpose, (2) its primary effect is to either advance or inhibit religion, or (3) it fosters an excessive entanglement of government with religion. *See Doe v. Indian River Sch. Dist*., 653 F.3d 256, 283 (3d Cir. 2011) (citing *Lemon*, 403 U.S. at 612-23).

The Court has employed the *Lemon* test on many occasions, but its continuing applicability is unclear. For example, in *Marsh v. Chambers*, the Court upheld the Nebraska Legislature's practice of opening each session with prayer without applying the *Lemon* test, 463 U.S. 783, 791 (1983), yet the Court applied the test a year later in *Lynch v. Donnelly*, 465 U.S. 668, 680-83 (1984), to uphold a city's display of a nativity scene in a public park. Similarly, on the same day in 2005, the Court rendered two decisions involving public displays of the Ten

Commandments, but applied the *Lemon* test in only one of the two cases. *See McCreary Cty. v. American Civil Liberties Union of Ky.*, 545 U.S. 844 (2005) (applying the *Lemon* test and rejecting the county's request to abandon the test); *Van Orden v. Perry*, 545 U.S. 677 (2005) (deciding that the *Lemon* test was "not useful" in dealing with passive monuments). The Court has since resolved other Establishment Clause cases without applying the *Lemon* test. *See, e.g.*, *Zelman v. Simmons-Harris,* 536 U.S. 639 (2002) (upholding a government aid program without applying the *Lemon* test); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) (holding that permitting a Christian club to hold meetings on public school premises was constitutional without applying the *Lemon* test).

Various Justices, other federal judges, and legal scholars also have widely criticized the *Lemon* test because it produces unpredictable results.[2] *See, e.g.*, *Van Orden v. Perry*, 545 U.S. 677, 694, 697 (2005) (Thomas, J., concurring) (pointing out that "[a]ll told, this Court's jurisprudence leaves courts, governments, and believers and nonbelievers alike confused" and "the very 'flexibility' of this Court's Establishment Clause precedent leaves it incapable of consistent application"); *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 655, 669 (1989) (Kennedy, J., concurring in part and

---

[2] *Lemon*'s unpredictable application, coupled with the threat of having to pay plaintiffs' attorneys' fees pursuant to 42 U.S.C. § 1988, has caused many government defendants to choose settlement over defending themselves in court. Thus, because a government cannot be certain that a religious expression will survive *Lemon*, that government is likely to remove the expression rather than litigating the issue and risking burdening taxpayers with litigation costs. *See, e.g.*, Patrick M. Garry, *A Congressional Attempt to Alleviate the Uncertainty of the Court's Establishment Clause Jurisprudence: The Public Expression of Religion Act*, 37 Cumb. L. Rev. 1, 4-6 (2007). The result is that the unpredictable law and the fee-shifting statute chill religious expression that the First Amendment might protect, and coerce governments into settling rather than defending their actions. For this reason, a bill called the Public Expression of Religion Act ("PERA") was introduced into the United States House of Representatives that would have prevented the fee-shifting provisions of § 1988 from applying to Establishment Clause cases. *See* 152 Cong. Rec. H7389 (daily ed. Sept. 26, 2006) (statement of Rep. Smith) ("[PERA will] eliminate the chilling effect on the constitutionally protected expression of religion by state and local officials that results from the threat that potential litigants may seek damages and attorney's fees . . . ."); 152 Cong. Rec. H7393 (daily ed. Sept. 26, 2006) (statement of Rep. Hostettler) (arguing that PERA would "prevent the mere threats of the legal system to intimidate communities, States, and groups like the American Legion into relenting without ever darkening the doorsteps of a Federal courthouse"). The bill was never passed, but would have alleviated the chilling effect that *Lemon* and the threat of fee-shifting currently have on government speech.

dissenting in part) (explaining that "I am content for present purposes to remain within the *Lemon* framework, but do not wish to be seen as advocating, let alone adopting, that test as our primary guide in this difficult area," and "submit[ting] that the endorsement test is flawed in its fundamentals and unworkable in practice"); *Edwards v. Aguillard*, 482 U.S. 578, 636 (1987) (Scalia, J., dissenting) ("Our cases interpreting and applying the purpose test have made such a maze of the Establishment Clause that even the most conscientious governmental officials can only guess what motives will be held unconstitutional."); *Wallace*, 472 U.S. at 112 (Burger, J., dissenting) ("If a constitutional theory has no basis in the history of the amendment it seeks to interpret, is difficult to apply and yields unprincipled results, I see little use in it."); *Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 869-71 (7th Cir. 2012) (Easterbrook, J., dissenting) (criticizing current Establishment Clause jurisprudence). Some Justices have offered alternative tests such as the tests propounded by Justices Thomas and Scalia that focus on whether the government action is coercive. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 52-53 (2004) (Thomas, J., concurring); *Lee v. Weisman*, 505 U.S. 577, 642 (1992) (Scalia, J., dissenting). In a concurring opinion, Justice O'Connor offered a clarification of the *Lemon* test, now known as the "endorsement test," and which the Court seems to have embraced in cases involving religious symbols on government property. *Lynch v. Donnelly*, 465 U.S. 668, 689 (1984) (O'Connor, J., concurring) (developing the endorsement test); *see also County of Allegheny*, 492 U.S. at 595 (1989) (adopting the endorsement test because it "provides a sound analytical framework for evaluating governmental use of religious symbols"). In offering the endorsement test, Justice O'Connor suggested that in cases involving religious symbols, courts focus on (1) what the government defendant intended to communicate in displaying the symbol,

and (2) what message the symbol actually conveys to reasonable observers.  *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring).

The Third Circuit has adopted the endorsement test, but because the Supreme Court has not yet overruled the *Lemon* test, the court continues to apply parts of the *Lemon* test. Accordingly, in cases involving religious symbols, the Third Circuit applies the purpose prong of the *Lemon* test and asks whether the defendant has demonstrated that the religious symbol at issue has a secular purpose. Then, the court applies the endorsement test and asks whether a reasonable observer would perceive the display as a government endorsement of religion.  If the symbol lacks a secular purpose, or if the reasonable observer would perceive the symbol as endorsing religion, the symbol violates the Constitution.  *See Doe v. Indian River Sch. Dist.,* 653 F.3d 256, 283 (3d Cir. 2011); *Modrovich v. Allegheny Cty., Pa.,* 385 F.3d 397, 401 (3d Cir. 2004); *Freethought Soc. Phila. v. Chester Cty.*, 334 F.3d 247, 267 (3d Cir. 2003).

The position of this court in the Article III hierarchy requires that it apply this hybrid *Lemon*-endorsement test.  It is worth noting, however, that the test does not accurately reflect the plain text of the Establishment Clause or its drafters' intent.  As evidenced by the statements described above, Madison was concerned with freedom of conscience, and protecting citizens from the government coercing them into adhering to or participating in religion.  There is a stark difference between the government acting with a religious purpose, as the first prong of the *Lemon* test forbids, and the government forcing religion onto its citizens.  Likewise, the fact that an observer might reasonably perceive a government-sponsored display as encouraging religion does not necessarily mean that it would also be reasonable for the observer to perceive that display as *requiring* the observer's religious participation.  Accommodation is not establishment. Nor is acknowledgement, or mere expression.  "The holder of a nickel need not trust in God, no

matter what the coin says." *American Jewish Cong. v. City of Chi.*, 827 F.2d 120, 133 (7th Cir. 1987) (Easterbrook, J., dissenting). Just as the Supreme Court has upheld legislative prayer as "simply a tolerable acknowledgment of beliefs widely held among the people of this country" rather than an establishment of religion, *Marsh*, 463 U.S. at 792, the passive government symbol at hand acknowledges the values shared by the citizens of Lehigh County at the time of its founding without establishing a compulsory, county-wide religion. Courts need not strip communities of all religious sentiment in order to ensure that no national, state, or local churches are established.[3] Such hostility towards religion creates "the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid." *Van Orden*, 545 U.S. at 704 (Breyer, J., concurring). Seals and flags do not carry the force of law, and the citizens of Lehigh County need not fly the County Flag, or adhere to the values that it depicts. Just as the County's citizens need not value education, agriculture, cement, or bison, they need not value Christianity. As long as citizens are free to practice any religion that resonates with them, or no religion at all, the fact that some might be offended by the Seal is an issue best addressed by elected officials, rather than the courts. Again, however, the court is bound by *stare decisis*, must apply the law as it stands, and will leave these issues to appellate courts to address in the future.

## B.    Standard of Review

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings,

---

[3] The court also briefly notes that some Supreme Court Justices, judges, and legal scholars are of the opinion that neither the drafters of the Bill of Rights nor the drafters of the Fourteenth Amendment intended for the Establishment Clause to apply to the states. *See, e.g.*, *Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811, 1835-38 (2014) (Thomas, J., concurring); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 45-54 (2004) (Thomas, J., concurring); *Lee v. Weisman*, 505 U.S. 577, 641 (1992) (Scalia, J., dissenting); Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1484-85 (1990).

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute"). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (indicating that a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*,

172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor").  Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).  Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case."  *Jones v. Beard*, 145 F. App'x 743, 745-46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322).  Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).  Nonetheless, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe

it," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## C.     Analysis

In determining whether a religious symbol on government property runs afoul of the Establishment Clause, the court must apply the *Lemon* test as modified by the endorsement test. *Modrovich*, 385 F.3d at 401.   Under the three-pronged *Lemon* test, the challenged government action is unconstitutional if (1) it lacks a secular purpose, (2) its primary effect either advances or inhibits religion, or (3) it fosters an excessive entanglement of government with religion.   *Id.* (citing *Lemon,* 403 U.S. at 612-13).   The endorsement test modifies *Lemon* by dispensing "with *Lemon*'s 'entanglement' prong and, combining an objective version of *Lemon*'s 'purpose' prong with its 'effect' prong, asks whether a reasonable observer familiar with the history and context of the display would perceive the display as a government endorsement of religion." *Id.* (footnote omitted) (citing *Lynch,* 465 U.S. at 687 (O'Connor, J., concurring)).   Because of uncertainty as to what test the Supreme Court would presently employ in analyzing cases involving religious symbols on government property, the Third Circuit essentially applies the purpose prong of *Lemon* in addition to the endorsement test.   If the symbol fails either test, the court must hold that it violates the Establishment Clause.[4]

### 1.     The Purpose Prong

"The purpose prong of the *Lemon* test asks whether [the] government's actual purpose is to endorse or disapprove of religion." *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring).   The

---

[4] The court has concluded that each individual plaintiff has standing to sue the County, and the County does not argue otherwise.   As set out above, the undisputed facts demonstrate that each individual plaintiff has had direct, unwelcome contact with the Seal, and is likely to have such contact with the Seal in the future.   *See Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 479 (3d Cir. 2016) (holding that a community member bringing an Establishment Clause challenge "may establish standing by showing direct, unwelcome contact with the allegedly offending object or event, regardless of whether such contact is infrequent or she does not alter her behavior to avoid it").

purpose prong of *Lemon* requires only *some* secular purpose, and not that each purpose behind the religious symbol is exclusively secular. *Lynch,* 465 U.S. at 681 n.6; *Freethought*, 334 F.3d at 262. The court must consider not only the government's original purpose for displaying the symbol, but also its purpose for leaving the symbol in place in response to a request to remove the symbol. *Freethought*, 334 F.3d at 261-62. In fact, the court's "primary focus" must be on the events at the time when the government refused to remove the religious symbol, rather than on the events at the time the symbol was adopted. *Modrovich*, 385 F.3d at 410. Finally, the inquiry is subjective; thus, the court should defer to the government's articulation of a secular purpose, *Freethought*, 334 F.3d at 268, if "the statement of such purpose [is] sincere and not a sham." *Edwards v. Aguillard*, 482 U.S. 578, 586-87 (1987).

The only evidence that the parties have provided the court as to the County's original purpose in choosing to include a cross on the Seal is Commissioner Hertzog's statement, included in the Historical Society article, describing what each symbol on the Seal was meant to signify. Commissioner Hertzog stated that the cross signified "the God-fearing people which are the foundation of our County." Pls.' Facts at ¶¶ 12, 13; Def.'s Resp. at ¶¶ 12, 13; Def.'s Facts at ¶ 6; Pls.' Resp. at ¶ 6. Thus, the undisputed facts demonstrate that the County's original purpose for including a cross on the Seal is not secular. The County's stated reason for retaining the seal in 2015 was to honor its original settlers who were Christian, and the County clarified that it based this reasoning on an interpretation of Commissioner Hertzog's statements. Affidavit of Brad Osborne at ¶¶ 6-7. While the court must defer to the government's articulation of a secular purpose, the court cannot hold that the County's articulated purpose is secular. Honoring the settlers by retaining a cross on the Seal is the equivalent of honoring the fact that the settlers were Christian. Further, other courts have rejected similar appeals to community history. *See*

*Robinson v. City of Edmond,* 68 F.3d 1226, 1232 (10th Cir. 1995) (observing that honoring history is "an argument which could always 'trump' the Establishment Clause, because of the undeniable significance of religion and religious symbols in the history of many of our communities"); *Harris v. City of Zion*, 927 F.2d 1401, 1414 (7th Cir. 1991) ("With such explicit religious design behind the seal's original adoption in 1902, something more than a perfunctory appeal to history is required to legitimatize the underlying purpose of this particular seal."). Thus, both the County's original purpose in including the cross on the Seal in 1944 and in retaining the cross on the Seal in 2015 fail *Lemon*'s purpose test. No disputed issue of material fact exists. While this alone renders the Seal unconstitutional, the court will proceed to the endorsement test in the event that a higher court requires that test's application.

## 2. The Endorsement Test

The endorsement test, which is akin to the primary effect prong of *Lemon*, *see Indian River*, 653 F.3d at 284, shifts the focus from the government's actual, subjective purpose to the objective effect of the challenged practice. Because the endorsement test is an objective inquiry, the government's motivations are irrelevant. *Modrovich*, 385 F.3d at 401. The test asks "whether a reasonable observer familiar with the history and context of the display would perceive the display as a government endorsement of religion." *Id.* Stated slightly differently, the court must determine whether the symbol would "leave the reasonable nonadherent with the impression that his or her religious choices were disfavored." *American Civil Liberties Union of N.J. v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1487 (3d Cir. 1996).

"[T]he reasonable observer is more knowledgeable than the uninformed passerby." *Freethought*, 334 F.3d at 259. The reasonable observer is aware of the age, history, and ubiquity of the display, and knows whether the government has celebrated or highlighted the display. *Id.*

at 262. While history is a part of the context in which a reasonable observer evaluates the display, "historical patterns cannot justify contemporary violations of constitutional guarantees." *Marsh v. Chambers*, 463 U.S. 783, 790 (1983). Thus, while "courts should examine the age and relevant history surrounding the use of the display as part of the context in which the reasonable observer views it," age and history do not raise a presumption of constitutionality. *Freethought*, 334 F.3d at 261 n.10.

In this case, the reasonable observer would know that the cross is a symbol of Christianity, that the settlers of Lehigh County were Christian, and that Commissioner Hertzog designed the Seal with the God-fearing people of the County in mind. The reasonable observer would also know, as the County contends, that the Seal was adopted more than seventy years ago, has since existed without challenge, and that the other symbols on the Seal are wholly secular.[5] With this knowledge base in mind, the court must conclude that a reasonable observer would perceive the Seal as endorsing Christianity. It is true that the Seal includes various secular symbols that highlight other features and values of the County. But the largest and most central symbol is the yellow Latin cross, which the parties agree is the preeminent symbol of Christianity. In looking at the size and placement of the cross, which dwarfs the other symbols on the Seal, the value that the County places on Christianity, and Christianity's role in the County's history, is unmistakable.[6] Further, as the *Freethought* court noted, the fact that the Seal

---

[5] The County also contends that the reasonable observer would know that the County has not taken any official action to highlight or draw attention to the cross on the Seal. Brief in Supp. of Def.'s Mot. for Summ. J. at 28, Doc. No. 19-1. The court disagrees. The reasonable observer knows that a county's seal is the stamp of the government. Official action draws attention to the cross on the Seal, for example, every time a citizen receives a document on County letterhead, every time the Board holds a meeting in the Public Hearing Room, and every time it is included on a new County vehicle.

[6] Even if the cross were not the central and largest symbol on the Seal, one could argue that the fact that the cross is so well known as a symbol of Christianity would be enough to conclude that a reasonable observer would perceive the Seal as endorsing Christianity. *See Robinson*, 68 F.3d at 1233 ("We too decline to hold that some visible and clearly defined religious images are permissible while other identically visible religious images are not."); *Harris*,

is longstanding is part of the context in which the reasonable observer views it, but does not alone raise a presumption of constitutionality. 334 F.3d at 261 n.10 ("[B]y stressing that history is only part of the context of a display, and not giving a presumption of constitutionality to historic artifacts or monuments, we ensure that displays that do have the effect of endorsing religion are not held to be constitutional simply because of their age."). In this case, neither the longevity of the Seal nor the secular symbols surrounding the cross detract from the religious message that a cross conveys to the reasonable observer. Thus, the court must hold that the Seal also fails the endorsement test.

## IV.    CONCLUSION

Lehigh County's Seal is a passive symbol that does not coerce any citizen to practice or adhere to Christianity, and does not establish a county religion. Thus, the Seal does not violate the plain text of the Establishment Clause. Nor does it establish religion in the way the drafters of the First Amendment imagined. Higher courts, however, have delineated a different mechanism by which the court must determine whether the Seal survives constitutional scrutiny. While the court may not fully agree with the test provided, the court must apply that test. Thus, the court must grant the plaintiffs' motion for summary judgment, and deny the defendant's motion for summary judgment.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.

---

927 F.2d at 1412 (holding that the symbols on a city seal express the city's approval of those "pictures of City life—its flora, its schools, its industry and commercial life, and its Christianity").